IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLE DAVIS <br> Parent and next friend of S.D. <br> and S.D. individually <br> 420 12th Street SE <br> Washington, DC 20003 <br><br> Plaintiff, <br> v. <br><br> DISTRICT OF COLUMBIA <br> A Municipal Corporation <br> One Judiciary Square <br> 441 Fourth Street, NW <br> Washington, D.C. 20001 <br><br> to serve: <br><br> MURIEL BOWSER, Mayor <br> District of Columbia <br> 441 4th Street, N. W.,   6th Fl <br> Washington, D.C. 20004 <br><br> KARL A. RACINE <br> Attorney General <br> 441 4th Street, N. W.,   6th Fl <br> Washington, D.C. 20004 <br><br> Defendant. | Civ. A. No: |

## COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE AND OTHER RELIEF

COMES NOW, the Plaintiffs Nicole Davis and her child, minor student S.D., by and through counsel, James E. Brown & Associates, P.L.L.C., and respectfully unto this Honorable Court state as follows:

1

## INTRODUCTION

This is a claim for injunctive and declaratory relief brought under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ("IDEA"). The Plaintiff seeks a judgment 1) declaring that the District of Columbia Public Schools ("DCPS") violated the IDEA and denied S.D. a free appropriate public education ("FAPE"), 2) Ordering the Defendant to place and fund S.D. in an appropriate full-time therapeutic setting with a dedicated aide, including funding transportation, and to fund compensatory education.

## JURISDICTION AND VENUE

1. This court has jurisdiction pursuant to:
    a. The Individuals with Disabilities Educational Improvement Act, 20 U.S.C. §§ 1400-1461 ("IDEIA"), and pendent jurisdiction pursuant to D.C. Mun. Regs. Title 5 §§ 3000.1 – 3701.3 (2003);
    b. Declaratory Relief is authorized by 28 U.S.C. §§ 2201 and 2202.
2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.
3. On September 19th and 20th the Plaintiffs participated in an administrative hearing of the claims made in this Complaint conducted by the District of Columbia Office of the State Superintendent of Education ("OSSE") Office of Dispute Resolution. In an order dated October 3, 2023, the Hearing Officer found against the Plaintiffs on the issues asserted in this Complaint and denied her the relief requested. *See* Exhibit 2.

## PARTIES

2

4. Plaintiff Nicole Davis is the parent of her minor child, S.D., a minor student who has been deemed eligible to receive special education and related services from the District of Columbia Public Schools ("DCPS").

5. Plaintiff S.D. is a minor student who has been deemed eligible to receive special education and related services from DCPS.

6. Plaintiffs, at all times relevant to this action, have been residents of the District of Columbia.

7. That Defendant is a municipal corporation that receives federal funds pursuant to the IDEA, *see* 20 U.S.C. § 1411, in exchange for providing a free and appropriate public education ("FAPE"), and is obliged to comply with the applicable federal regulations and statutes, including but not limited, to IDEIA. *See also* § 1412(a)(1)(A).

## FACTUAL BACKGROUND

1. S.D. is a is a 12-year-old student who resides with her parent, Ms. Nicole Davis in the District of Columbia. During the 2022-2023 school year, she was enrolled at Stuart-Hobson Middle School in the 6th grade.

2. The student enrolled at Stuart-Hobson for the 2022-2023 school year with an Individualized Education Program (IEP) that had been developed by Two Rivers Public Charter School on or about June 8, 2022.

3. This IEP identified S.D. as eligible for services under the classification of Multiple Disabilities for a specific learning disability and other health impairment due to ADHD.

4. This IEP provided for S.D. to receive 45 minutes per day of specialized instruction in mathematics outside of the general education setting and 10 hours a week of specialized instruction inside the general education setting in mathematics, reading, and written expression.

5. This IEP also provided S.D. with 120 minutes a month of behavioral support services (BSS) outside of the general education setting.

6. On or about January 10, 2023, at the parent's request, the Defendant held an Analysis of Existing Data (AED) meeting and agreed to re-evaluate the student to address concerns of a possible Autism diagnosis.

7. On or about Friday, February 3, 2023, the student indicated an intent to commit suicide with scissors at school.

8. Specifically, a witness to the incident said that when asked "are you planning on doing anything with those scissors," she took the scissors and gestured towards her wrists.

9. At this time, she was taken to Children's National Medical Center (CNMC).

10. At CNMC, it was noted that the student was experiencing "active [suicidal ideation] with plan" and described her as having "an episode at school where [patient] grabbed scissors and threatened to harm herself and another student who has been bullying her."

11. At this time, S.D. told staff at CNMC that she would "rather not be here" than deal with the students picking on her.

12. While at CNMC S.D. had a breakdown, hit her head on the walls, and told her mother that two students and a teacher had been bullying her at school.

13. While at CNMC, the psychiatrist who met with her indicated that she should not return to the same school, however, this recommendation was not put in writing.

14. S.D. has been receiving psychiatric care since that time.

15. Based on student reports, the incident was precipitated by bullying she received from peers in the school setting.

4

16. On or about February 8, 2023, an emergency meeting was held at the school. At this meeting the parents requested that the school revise the student's IEP to provide for a more restrictive environment considering the student's circumstances.

17. At this meeting, Ms. Davis noted that S.D. was bullied by other students, including calling her "special ed," "insane," and "stupid."

18. On or about February 13, 2023, the student's psychiatrist recommended that the student be assessed for autism.

19. On or about February 16, 2023, the student's physician completed paperwork recommending home based instruction and stated that the student's severe anxiety and depression created a severe risk of harm to herself and others.

20. She recommended that the student receive home instruction and that when she returned to a school environment, she have 1-1 supervision.

21. On or about February 27, 2023, DCPS School Psychologist Kristin Dezen completed an initial psychological re-evaluation for the student but as a result of the student's hospitalization and medical absences was unable to comprehensively evaluate.

22. The above referenced evaluation was reviewed at an eligibility meeting held on or about March 7, 2023, at which time it was agreed that the psychological evaluation was not comprehensive and would be supplemented and that a speech and language and occupational therapy evaluation would also be conducted on behalf of the student.

23. At the March 7, 2023, meeting, the parent again requested that DCPS revise the student's IEP to provide for a more restrictive environment considering her circumstances.

24. On March 29, at a medical appointment, S.D. again expressed a desire to harm herself was taken to CNMC.

25. On or about March 2, 2023, the school submitted the paperwork for Home and Hospital Instruction Program (HHIP). Home based tutoring services were never put into place by HHIP, instead the parent arranged for daily tutoring via a private provider.

26. DCPS completed a revised psychological evaluation on or about May 28, 2023, which found that with regards to her cognitive functioning her Verbal Comprehension scores fell within the Average range (103), but her Fluid Reasoning fell within the Very Low range and her Processing Speed fell within the borderline delayed range which would make it difficult for her keep with pace with age appropriate peers in a general education setting.

27. The DPCS revised psychological utilized the Kaufman Test of Educational Achievement – Third Edition (KTEA-3) to assess her academic function and her scores fell in the low rage for mathematics and writing and represented a drop in performance from when she was administered the KTEA-3 in 2020.

28. There was also a decline in standardized testing such as the Scholastic Reading Inventory where her scores dropped from a 574 (2nd grade level) based on BOY testing to a 371 based on MOY testing.

29. Her math performance has remained below grade level.

30. The Social Responsiveness Scale administered revealed scores of 100 from M. Davis and 89 from S.D.'s teacher both consistent with autism spectrum disorder ("ASD")

31. A comprehensive Occupational Therapy evaluation was completed on or about May 28, 2023, which found that the student had significant difficulties sensory processing and social participation, as well scored significantly below average on hand eye coordination and had deficits in visual motor and visual perception.

6

32. Another eligibility/IEP meeting was held on or about June 6, 2023- at which time the Team agreed that the student met the criteria for eligibility under the classification Autism and her IEP was revised to provide for related Occupational Therapy and consultative Speech and Language services.

33. At the June 6, 2023 meeting, the parent requested that a dedicated aide be added to the student's IEP, an increase in specialized instruction to full-time (27.5) hours and inclusion of adaptive goals.

34. The Defendant would only agree to provide the student with ten (10) hours of specialized instruction outside the general education setting and ten (10) hours of specialized instruction inside the general education setting.

35. On July 3, 2023 Ms. Davis filed the underlying complaint.

36. On September 10th and 20th, 2023, a due process hearing was held on Ms. Davis's complaint.

37. At hearing, Ms. Davis presented the testimony of Dr. Wilma Gaines, an educational advocate, qualified as an expert in special education.

38. Dr. Gaines testified to S.D.'s needs, including her need for "extensive" remediation in math, that her reading was significantly below grade level, and that she would have extreme difficulty with a general education curriculum.

39. Dr. Gaines also testified that at the June 3 meeting, S.D.'s outside psychiatrist recommended that she not return to school and be placed in a therapeutic environment when she did return.

40. Dr. Gaines also testified to her own recommendation that S.D. receive 27.5 hours of specialized instruction per week, a dedicated aide, an increase in her behavior support services, and to be placed a therapeutic setting.

41. Dr. Gaines further testified that S.D.'s IEP should have been revised in February 2023 after the incident with scissors.

7

42. In considering that issue the Hearing Officer concluded that S.D.'s behavior was "suicidal ideation" rather than a suicide attempt.

43. He does not explain why this distinction is relevant to determining if the school should have updated her IEP to reflect this dramatic behavior.

44. In reaching this conclusion the Hearing Officer relies on the testimony of a special education teacher, Nancy Abou-Samra, however, his description of her testimony is inaccurate.

45. The Hearing Officer describes her testifying that S.D. "gestured toward her wrist" when asked why she had scissors on her desk and states that according to Ms. Abou-Samra's testimony S.D. did not "grab the scissors."

46. In her testimony, Ms. Abou-Samra stated that she asked the student "are you planning on doing anything with those scissors" and that in response, she took the scissors and gestured towards her wrists.

47. She further testified that although she did not touch the scissors to her wrist "it was clear that she was telling me that that was her plan."

48. While she was at Children's National Medical Center, S.D. disclosed to a psychiatrist that she had been bullied at school.

49. When asked if she had witnessed bullying of the student, Ms. Abou-Samra testified that "I feel like it's a tricky question" and acknowledged incidents that S.D. may have perceived as bullying.

50. Despite this, the Hearing Officer concluded that there was "no credible evidence of bullying."

51. At Hearing, Ms. Davis offered the testimony of Thomas Davis, a licensed professional counselor who was familiar with S.D.

52. Mr. Davis has a master's degree in counselling psychology, as well as a bachelor's degree in psychology; he is a licensed professional counselor as well as a licensed professional clinical counselor.

53. Mr. Davis has worked in public charter schools supporting special education students in a variety of roles, including as a special education teacher, care coordinator, school social worker, and Dean of Culture/behavior specialist.

54. In the role of Dean of Culture, Mr. Davis testified that his role involved ensuring that students had access to their education and ensuring that teachers complied with IEPs.

55. He summarized this role as everything that relates to "behavior, adjustment, and social, and emotional learning."

56. He further testified that he had developed IEP goals for students and been part of numerous IEP meetings.

57. Despite this extensive experience, the Hearing Officer refused to let him offer an opinion on S.D.'s needs.

58. Ms. Davis also presented the testimony of herself and S.D.'s father concerning her needs and the recommendations of her psychiatrist that S.D. not return to school following the February 2023 incident and that she be placed in a therapeutic setting.

59. Ms. Davis attempted to present a recommendation from a nurse practitioner regarding S.D.'s needs.

60. This recommendation stated that S.D. required a full-time therapeutic placement with a 1:1 aide and should not return to her previous school.

61. Despite the fact that the Defendant withdrew its objection to this document, and indeed, disclosed the same document in its evidence, the Hearing Officer refused to admit this document as evidence.

62. On October 2, 2023, the Hearing Officer issued an order finding that Ms. Davis had not met her burden of proof.

63. Now, Ms. Davis brings this complaint to address the Hearing Officer's errors described above.

## COUNT I
### (Failure to timely update S.D.'s IEP in response to her suicidality at school)

64. Plaintiffs reincorporate paragraphs 1-63

65. The IDEA was enacted by Congress to, "ensure that *all* children with disabilities have available to them a free appropriate public education [(herein referred to as "FAPE")]" which courts have defined as "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction. 20 U.S.C. § 1400 (d)(1)(A). *See also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. V. Rowley*, 458 U.S. 176, 189 (1982) (emphasis added).

66. "The IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 994, 197 L. Ed. 2d 335 (2017), quoting *Honig v. Doe*, 484 U.S. 305, 311, 108 S. Ct. 592, 98 L.Ed.2d 686 (1988). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994, quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).

67. The IDEA further requires that each public agency must review and revise a student's IEP not less than annually to address lack of expected progress or changes in the student's needs. *See* 20 USC 1414 (d)(4).

68. Here, S.D.'s anticipated needs changed markedly based on the incident of, at a minimum, suicidal ideation with the scissors, her psychiatric hospitalization, and her revealing that she had been bullied.

10

69. Despite the substantial evidence of these changed needs, the Hearing Officer excused the school's decision not to change S.D.'s IEP at this time.

70. This decision was in error and should be reversed.

## COUNT II
### (Failure to develop an appropriate IEP for S.D. on June 6, 2023)

71. Plaintiffs reincorporate paragraphs 1-70.

72. The IDEA was enacted by Congress to, "ensure that *all* children with disabilities have available to them a free appropriate public education [(herein referred to as "FAPE")]" which courts have defined as "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction. 20 U.S.C. § 1400 (d)(1)(A). *See also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. V. Rowley*, 458 U.S. 176, 189 (1982) (emphasis added).

73. Here, the IEP offered on June 6, 2023 was insufficient to meet S.D.'s needs.

74. S.D. had experienced three several incidents where she evinced a desire to harm herself or others because of incidents at school. The recommendation of her treatment team was that she not return to that school.

75. She requires a therapeutic environment and a dedicated aide to address those emotional issues which and impacting her in the classroom.

76. She further requires adaptive goals on account of her low scores in that domain on her May 2023 evaluation.

11

77. The Hearing Officer erred in considering the evidence that was provided and in excluding admissible evidence concerning S.D.'s needs.

78. For these reasons, the Hearing Officer's decision is in error and should be set aside.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Court:

1) Reverse the October 2, 2023, HOD and find that S.D. was denied FAPE on each of the alleged issues.

2) Order the Defendant to revise S.D.'s IEP to be appropriate, including placement in a full-time therapeutic setting with a dedicated aide

3) Order the Defendant to provide compensatory education for these denials of FAPE,

4) Or, in the alterative, remand the case the hearing officer for consideration of appropriate compensatory education and other relief

5) Award the Plaintiff attorneys' fees and costs for this action;

6) Award any other relief the Court deems appropriate.

**Respectfully submitted,**

ROBERT W. JONES, Bar No. DC997776
Associate Attorney
James E. Brown & Associates, PLLC
1220 L Street, 7th Floor
Washington, D.C. 20005
(202) 742-2000 (voice)
(202) 742-2098 (fax)
**Attorneys for Plaintiffs**